**Richard A. GINSBURG,
Petitioner–Appellant,**

v.

**UNITED STATES of America,
Respondent–Appellee.**

**No. 89–1288.**

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 25, 1990.
Decided Aug. 3, 1990.

Jeffrey B. Steinback, Marc W. Martin, Genson, Steinback & Gillespie, Chicago, Ill., for petitioner-appellant.

Thomas M. Durkin and Matthew M. Schneider, Asst. U.S. Attys., Office of U.S. Atty., Crim. Receiving, Appellate Div., Chicago, Ill., for respondent-appellee.

Before WOOD, Jr., CUDAHY, and COFFEY, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

In early 1984, a jury found Richard A. Ginsburg guilty of 19 counts of mail fraud under 18 U.S.C. § 1341 and one count of racketeering under 18 U.S.C. § 1962(c), all of which stemmed from Ginsburg's payments to fix cases while practicing before the Cook County Board of Tax Appeals ("the Board"). Following the Supreme Court's decision in *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97

L.Ed.2d 292 (1987), Ginsburg filed his section 2255 petition seeking to vacate and set aside the judgment and sentence.[1] On January 10, 1989, the district court entered an order granting his petition. The government subsequently filed a motion to reconsider in light of our decision in *United States v. Doe*, 867 F.2d 986 (7th Cir.1989), and on February 2, 1989, the district court granted the government's motion and dismissed Ginsburg's petition on the merits. For the reasons discussed below, we affirm the dismissal of Ginsburg's section 2255 petition.

## I. BACKGROUND

Ginsburg's convictions flow from a scheme that began in 1975 in which he and Theodore J. Schmidt, who was then his law partner, made payments in cash to employees of the Board in order to have real estate tax assessments reduced on properties owned by their clients. A reduction in a real property tax assessment requires the concurrence of both commissioners of the Board. Under the scheme, the deputy commissioners, with the aid of other Board employees, granted reductions in select cases by forging the approval initials of one commissioner and processing the files through the other commissioner's office without his review. Ginsburg paid Deputy Commissioner Donald Erskine ten percent of the legal fees Ginsburg obtained in connection with these tax reductions. During the life of the scheme, Ginsburg made cash payments to Erskine approximately twenty-five times for a total amount of $18,000. Ginsburg also made cash payments totalling approximately $2,500 to hearing officer Jimmie Smith in return for his assistance in fraudulently processing complaints through the Board. In the 1975 tax year Ginsburg was successful in eighty-four percent of his cases before the Board, in the 1976 tax year he was successful in ninety-one percent of his cases, and in the 1977 tax year he was successful in seventy-two

---

1. On direct appeal, Ginsburg challenged only the forfeiture order that the district court entered pursuant to the racketeering conviction. This court reversed the order, *United States v.* *Ginsburg*, 753 F.2d 1079 (7th Cir.1979), but then affirmed the forfeiture order after rehearing the case *en banc*. *United States v. Ginsburg*, 773 F.2d 798 (7th Cir.1985).

percent of his cases. After the federal investigation of the Board began in 1978, Ginsburg's success rate dropped to forty-five percent.

After Ginsburg was convicted, the Supreme Court decided *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). *McNally* held that while the mail fraud statute, 18 U.S.C. § 1341, clearly protects property rights, schemes to defraud the citizenry of the intangible right to good government do not fall within the statute's scope. *Id.* at 356, 107 S.Ct. at 2879. Relying on *McNally*, Ginsburg challenges his conviction for mail fraud on three grounds: (1) the indictment failed to state an offense, (2) the jury instructions demonstrate that he was convicted under an "intangible rights" theory,[2] and (3) the government did not attempt to show, and the jury could not have found, that the mail fraud scheme operated to cause a loss of money or property.

## II. ANALYSIS

### A. *The Indictment*

Ginsburg contends that he is entitled to relief under section 2255 because he was charged in the indictment with a mail fraud violation under the "intangible rights" theory, which is no longer a viable theory of prosecution after *McNally*. Section 2255 provides relief for a prisoner "claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or the Laws of the United States." Custody that is the result of an indictment that fails to state an offense violates the laws of the United States. *United States v. Keane*, 852 F.2d 199, 204 (7th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 2109, ·104 L.Ed.2d 670 (1989).

In determining whether an indictment charges an offense under *McNally*, we are required to look beyond how the scheme is legally characterized in the indictment and "examine whether 'the specific conduct alleged in the indictment is clearly proscribed by the mail fraud statute.' " *Doe*, 867 F.2d at 988 (citation omitted), *see also Bateman v. United States*, 875 F.2d 1304, 1308 (7th Cir.1989); *United States v. Bonansinga*, 855 F.2d 476, 480 (7th Cir.1988); *United States v. Wellman*, 830 F.2d 1453, 1463 (7th Cir.1987). An indictment alleging a deprivation of property rights is not defective under *McNally* just because it also alleges a deprivation of intangible rights. *United States v. Folak*, 865 F.2d 110, 113 (7th Cir.1988); *see also Ranke v. United States*, 873 F.2d 1033, 1035 (7th Cir.1989); *Doe*, 867 F.2d at 988–89. For example, *McNally* does not require setting aside the conviction "where a single set of facts establishes both a scheme to defraud a victim of money or property, as well as a deprivation of some intangible right." *Folak*, 865 F.2d at 113.

Finally, we recognize that our review of the sufficiency of the indictment is limited. An indictment cannot be questioned under section 2255 "unless it is so defective on its face as not to charge an offense under any reasonable construction." *Burchfield v. United States*, 544 F.2d 922, 924 (7th Cir. 1976), *cert. denied,* 430 U.S. 956, 97 S.Ct. 1602, 51 L.Ed.2d (1977). More generally, a court reviewing the sufficiency of an indictment "should consider the challenged count as a whole and should refrain from reading it in a hypertechnical manner." *United States v. Mosley*, 786 F.2d 1330 (7th Cir.) (quoting *United States v. Gironda*, 758 F.2d 1201, 1209 (7th Cir.), *cert. denied* 474 U.S. 1004, 106 S.Ct. 523, 88 L.Ed.2d 456 (1985)), *cert. denied,* 476 U.S. 1184, 106 S.Ct. 2919, 91 L.Ed.2d 548 (1986). An indictment must be read to include facts that the allegations it contains necessarily imply. With these principles in mind, we must consider the indictment itself.[3]

---

**2.** Although property rights may be intangible, *see Carpenter v. United States*, 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987), we use the term "intangible rights" to refer to the type of right at issue in *McNally*, namely, the right to an employee's honest and loyal services.

**3.** The following paragraphs of the indictment describe the scheme to defraud as follows:

> 7. Beginning at least as early as November, 1975, the exact date being unknown to the Grand Jury, and continuing until the date of this indictment, in the Northern District of Illinois, Eastern Division,

Paragraph 7 alleges an intangible rights theory of mail fraud, a point with which the government does not disagree. The indictment's sufficiency thus turns on whether other of its paragraphs describing the scheme to defraud Cook County ("the County") allege a cognizable offense after *McNally*.

In particular, the allegations in paragraphs 12 through 15 describe a scheme

> RICHARD A. GINSBURG and
> THEODORE J. SCHMIDT,
> defendants herein, together and with other co-schemers both known and unknown to the Grand Jury, devised and intended to devise a scheme:
> (a) to defraud the Board of Appeals and the citizens of Cook County of their right to the loyal, faithful, and honest services of Donald Erskine, Jimmie Smith, Thomas Lavin, Stephen Gorny and others in the performance of acts related to their public employment;
> (b) to defraud Cook County and its citizens, its public officials, and its public employees of their right to have the business of the Board of Appeals conducted honestly, fairly, and impartially, free from corruption, collusion, partiality, dishonesty, bribery and fraud; and
> (c) to defraud Cook County and its citizens of their right to have real estate property taxes assessed and collected free from the influence of corruption, collusion, partiality, dishonesty, bribery and fraud; which scheme was in substance as follows:
> 8. It was part of the scheme to defraud that defendants RICHARD A. GINSBURG and THEODORE J. SCHMIDT filed complaints and caused complaints to be filed at the Board of Appeals for the purpose of obtaining real estate property tax assessment reductions on behalf of their clients.
> 9. It was further a part of the scheme to defraud that defendants RICHARD A. GINSBURG and THEODORE J. SCHMIDT promised and made cash payments of approximately $18,000.00 to Donald Erskine which payments Donald Erskine was not authorized by law to accept, in order to influence him and to reward him for the performance of acts related to his public employment.
> 10. It was further a part of the scheme to defraud that RICHARD A. GINSBURG promised and made cash payments of approximately $1,500 to Jimmie Smith which payments Jimmie Smith was not authorized by law to accept, in order to influence him and to reward him for the performance of acts related to his public employment.
> 11. It was further a part of the scheme to defraud that RICHARD A. GINSBURG and THEODORE J. SCHMIDT caused approximately $1,085.00 in alleged legal fees to be paid to Stephen Gorny, which fees Stephen

pursuant to which Ginsburg paid bribes to various officials at the Board in return for their fraudulently processing tax complaints that Ginsburg filed for his clients and fraudulently reducing assessments. The indictment further alleges that under this scheme, Ginsburg obtained fraudulent assessment reductions for his clients in approximately 650 cases.

> Gorny was not authorized by law to accept, in order to influence him and to reward him for the performance of acts related to his public employment.
> 12. It was a further part of the scheme to defraud that defendants RICHARD A. GINSBURG and THEODORE J. SCHMIDT caused Donald Erskine, Jimmie Smith, Thomas Lavin, Stephen Gorny and other co-schemers to fraudulently process complaints filed at the Board of Appeals by RICHARD A. GINSBURG and THEODORE J. SCHMIDT on behalf of their clients and to fraudulently grant real estate property tax assessment reductions on those complaints. During the time relevant to this indictment, the co-schemers Erskine, Smith, Lavin, Gorny and others, fraudulently reduced assessments in approximately 650 cases filed on behalf of clients of defendants RICHARD A. GINSBURG and THEODORE J. SCHMIDT.
> 13. It was a further part of the scheme to defraud that defendants RICHARD A. GINSBURG and THEODORE J. SCHMIDT charged and received fees from their clients for obtaining real estate property tax assessment reductions at the Board of Appeals. The fees were in part based upon a percentage of the tax savings which the client enjoyed as a result of the assessment reduction. During the period of time relevant to this indictment, defendants RICHARD A. GINSBURG and THEODORE J. SCHMIDT received a total of approximately $650,000.00 in legal fees on cases that had been fraudulently processed at the Board of Appeals.
> 14. It was a further part of the scheme to defraud that the real estate assessment reductions which were obtained pursuant to the scheme to defraud were maintained on certain properties by the Assessor of Cook County and by the Board of Appeals for up to three succeeding years.
> 15. It was a further part of the scheme to defraud that the defendants RICHARD A. GINSBURG and THEODORE J. SCHMIDT did attempt to conceal the fact that they were paying bribes to Board of Appeals employees in order to obtain assessment reductions.

At trial, the government withdrew and struck the last sentence in paragraph 12, which alleged that the fraudulent assessment reductions totaled in excess of $20 million dollars.

Our decision in *United States v. Doe* controls this case. In *Doe*, we held that an indictment charging Stephen Gorny for offenses connected with his participation in the same scheme in which Ginsburg was involved was not invalidated by *McNally*. The indictment in *Doe*, substantially similar to the one in the present case, included "intangible rights" language as well as the substantive allegation that Gorny reduced the tax assessments of persons represented by attorneys in return for bribes offered to him by those attorneys. In reversing the district court's grant of section 2255 relief in *Doe*, we distinguished *Magnuson v. United States*, 861 F.2d 166 (7th Cir.1988), a case upon which Ginsburg heavily relies. We explained that the indictment in *Magnuson* "alleged only an intangible rights violation ... [while the indictment in Doe] included not only 'intangible rights' language but also the substantive allegation that Gorny received and accepted bribes from attorneys who appeared before the Board in return for which Gorny reduced the tax assessments of individuals represented by those attorneys." *Doe*, 867 F.2d at 988 n. 1.[4]

Nonetheless, Ginsburg contends that *Magnuson* rather than *Doe* should govern this case. To support this claim, Ginsburg points to the district court's statement in its original memorandum opinion and order ("*Ginsburg* I") that "Magnuson's indictment was strikingly similar to that against Ginsburg." 705 F.Supp. at 1310, 1318. Ginsburg, however, ignores the district court's discussion of *Doe* in its second sup-plement to *Ginsburg* I issued just after *Doe* was decided. There the district court stated that "[i]n factual terms Doe necessarily presents a closer parallel to Ginsburg's case than the similar pattern of corruption ... that produced the conviction in Magnuson...." *Id.* at 1326. More importantly, the court found that "the money-or-property allegations in the indictment in *Doe* correspond directly to the allegations in Ginsburg's Indictment [*sic*] ¶¶ 8, 12 and 14...." *Id.* at 1327. We agree with the district court's conclusion that *Doe* "plainly controls this case." *Id.* at 1328.[5] Ginsburg's indictment, like the indictment in *Doe*, alleges a scheme to defraud the County and its citizens of the intangible right to good government and faithful service (paragraph 7), and it also alleges a scheme to defraud the County of the tangible right to revenues by fraudulently reducing real estate property tax assessments (paragraph 12).

■ Ginsburg also argues that the indictment does not allege a deprivation of property as required by *McNally* on the ground that fraudulent tax assessments do not result in a decrease in tax revenues to the County. Ginsburg relies on the district court's discussion in *Ginsburg* I of the way in which the real estate tax system works. There the court explained that because total revenue is determined in advance and remains constant, fraudulent tax reductions have the effect of increasing the taxes of other County taxpayers rather than

---

**4.** To support the general allegation that Gorny participated in a scheme to defraud the citizenry of its "intangible right" to good government, the indictment in *Doe* alleged:

> 6. It was further part of the scheme to defraud that in return for the cash bribes, fees and other financial benefits and personal advantages described above, defendant, acting in his official capacity;
> a. granted assessment reductions on certain complaints filed and caused to be filed at the Board of Appeals by the attorneys and tax consultants from where defendant had received said benefits and personal advantages;
> b. reconsidered and granted reductions on certain complaints on which the Board of Appeals initially had denied the assessment

reductions requested by said attorneys and tax consultants.
*Id.* at 988–89.

**5.** Based on its independent examination of the record in *Magnuson,* the district court stated in its second supplemental order that the indictments in *Magnuson* and *Doe* are in fact indistinguishable. According to the district court, the discussion in *Doe* distinguishing *Magnuson* accurately reflects what the *Magnuson* court said about Magnuson's indictment but what the *Magnuson* court said about Magnuson's indictment does not accurately reflect how the indictment actually read. *Ginsburg,* 705 F.Supp. at 1327. Since *Magnuson* is not on appeal as part of the present case, we will not go behind the opinion as issued.

reducing total revenues to the County. *Id.* at 1317–18.[6]

Contrary to what Ginsburg implies in his brief, the district court did not view this as fatal to the indictment. Rather, the court discussed two approaches under which the indictment might be sustained: (1) the County would be deprived of a property interest if its right to collect taxes from Ginsburg's clients is viewed as the relevant property interest; (2) taxpayers other than Ginsburg's clients would be deprived of a property interest if the amount of their own real estate taxes is viewed as the relevant property interest. *Ginsburg* I, 705 F.Supp. at 1318. We believe that the indictment is sustainable under the first approach articulated by the district court. As we observed in *Doe*, under Illinois law, Cook County has a property interest in its tax revenues, both collected and uncollected. *See, e.g.,* ILL.REV.STAT. ch. 120, ¶ 697 (taxes on real property constitute a prior and first lien on the property); ¶ 705 (interest penalty is imposed on unpaid real estate taxes); ¶¶ 719–733 (sets out framework for forfeiture and sale of taxes for delinquent taxes).

Additionally, as the district court correctly noted, prior precedent provides support for viewing the County's right to collect taxes from Ginsburg's clients as the relevant property interest. In *United States v. Lynch*, 699 F.2d 839 (7th Cir.1982) and *Carter v. Berger*, 777 F.2d 1173 (7th Cir. 1985), this court rejected the zero-sum argument as to fraudulent real estate tax assessment schemes that involved Board employees, which schemes in fact were identical to the scheme in the present case. In *Lynch*, the defendant was convicted of mail fraud and conspiracy to commit racketeering for her participation in a scheme with her husband to fraudulently obtain real estate tax assessment reductions for clients in the same manner as did Ginsburg, that is, by bribing Board officials to bypass administrative procedures at the Board and grant reductions. In contesting the amount of restitution that the district court imposed on her, the defendant in *Lynch* contended that the County was not an "aggrieved party" under 18 U.S.C. § 3651[7] on the ground that the County suffered no actual loss since it recouped the revenues lost in the assessment reductions by increasing tax assessments for other property owners. We rejected her claim, stating that her "argument ignores the fact that the conspiracy deprived Cook County of tax revenues it was lawfully due." *Lynch*, 699 F.2d at 845.

Similarly in *Carter*, we held that the County, as the directly injured party, was the right plaintiff to bring a RICO action against the defendant for his participation in the same scheme as Ginsburg. The taxpayers in *Carter* filed suit against the defendant and the district court had dismissed their suit on the ground that they were not the real parties in interest. The taxpayers contended that they, rather than the County, should be permitted to bring suit since they had to pay a higher rate of tax to make up for the shortfall to the County resulting from the fraudulently reduced assessments. *Id.* at 1174. In affirming the district court's dismissal of their suit, we relied on our decision in *Lynch*, explaining that the ability of the County to recoup its loss does not defeat

---

**6.** The district court explained that real estate taxes are a function of three factors:

1. the total revenue ("TR" for "total revenue") County has determined is necessary to meet its operating budget for the fiscal year;
2. the sum of the equalized assessed valuations of all the properties within County's tax base ("TAV" for "total assessed valuations"); and
3. the tax rate ("r" for "rate"), which is determined by dividing the total revenue by the total assessed valuations:

$$r = \frac{TR}{TAV}$$

Total revenue, determined in advance, remains constant in setting the tax rate ($TR = TAV \times r$) so that r is increased when reductions in Ginsburg's clients' assessed valuations reduce TAV.

**7.** Section 3651 provides in pertinent part:

While on probation and among the conditions thereof, the defendant—

\* \* \* \* \* \*

May be required to make restitution or reparation to aggrieved parties for actual damages or loss caused by the offense for which conviction was had....

its recovery of losses from the underpayment of taxes. *Id.* at 1176.

We have already determined that the indictment alleged a scheme by which Ginsburg paid Board officials bribes in order to obtain fraudulent assessment reductions for his clients. Just as "[t]here is no basis ... for concluding that the victim of a fraud is not an aggrieved party simply because he obtains compensation from another source," *Lynch,* 699 F.2d at 845, there is no basis for concluding that the County was not deprived of its property interest in uncollected taxes from Ginsburg's clients simply because it was able to recoup these tax assessment losses by generally raising the tax rates.

We conclude that the substantive allegations contained in this indictment set out a scheme to deprive victims of property rights in violation of section 1341, thus charging an offense cognizable under *McNally.*[8]

## B. *Jury Instructions*

Ginsburg also contends that he is entitled to relief because the jury instructions were erroneous. *McNally* requires that we examine the jury instructions "to determine whether the conduct alleged and necessarily · found to have occurred by the jury constituted an offense." *Wellman,* 830 F.2d at 1462. Our review is again limited: "The question in such a collateral proceeding is 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process,' not merely whether 'the instruction is undesirable, erroneous, or even universally

condemned.'" *Henderson v. Kibbe,* 431 U.S. 145, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977) (citations omitted).

The district court instructed the jury that in order to convict for mail fraud, the government must prove both of the following propositions beyond a reasonable doubt:

> First, that the defendant you are considering knowingly· and intentionally devised, intended to devise, or participated in the scheme to defraud that is described in the indictment, and second, that for the purpose of carrying out that scheme or attempting to do that, the defendant you are considering caused the United States Mails to be used in the manner charged in the particular count. You will look at each count separately, see what it charges, and see whether, in your judgment, the government has proved that proposition beyond a reasonable doubt.

The phrases "intent to defraud" and "scheme to defraud" were defined in the jury instructions in the following way:

> That phrase, intent to defraud used in the charges of mail fraud in Counts 1 to 19, and those counts are incorporated into Count 20 as well, means that the acts charged were done knowingly with the intent to deceive the Board of Appeals, Cook County, and Cook County citizens, public officials and public employees in order to cause the loss of the loyal, faithful, or honest services of the Board of Appeals employees Donald Erskine, Jimmie Smith, Thomas Lavin, James Woodlock and Stephen Gorny in

---

8. In its brief and at oral argument, the government contended that the total revenue argument did not impugn the sufficiency of the indictment because the mail fraud statute proscribes only fraudulent schemes to defraud,. and it is not necessary that the scheme to defraud actually succeed. This argument is not without support. *See, e.g., Wellman,* 830 F.2d at 1461 (the essential elements of a mail fraud offense under 18 U.S.C. § 1341 are a scheme to defraud and the use of the mails in furtherance of that scheme). We have also observed that while *McNally* severely restricted the scope of the mail fraud statute, *McNally* does not require that actual loss of money or property be alleged in the indictment. *See United States v. Bucey,* 876

F.2d 1297, 1311 (7th Cir.) ("[S]ince the mail fraud statute punishes the *scheme* to defraud, this court has reiterated on numerous occasions that the ultimate success of the fraud and the actual defrauding of a victim are not necessary prerequisites to a successful mail fraud prosecution.") (citations omitted & emphasis in original), *cert. denied,* —— U.S. ——, 110 S.Ct. 565, 107 L.Ed.2d 560 (1989); *Keane,* 852 F.2d at 205 ("[T]he mail fraud statute proscribes fraudulent *schemes;* it does not confine penalties to those whose schemes succeed in raking off cash...") (emphasis in original). While the government's argument may have merit, we need not rest our decision on this ground.

their performance of their official duties, or in order to cause the loss of the honest, fair or impartial assessment and collection of real estate property taxes.

\*   \*   \*   \*   \*   \*

A scheme to defraud under this mail fraud statute means some plan to deprive another of something of value by fraudulent means.

The jury was also given this example of a scheme to defraud:

> A scheme by bribery of public officials to cause them to grant favorable results to people seeking those results, may constitute a scheme to defraud within the meaning of the mail fraud statute, and that is so whether or not the results obtained through the bribery scheme could have been obtained through some honest means.

Ginsburg argues that the first instruction, which sets out the elements of the mail fraud offense, plainly sounds in intangible rights. Ginsburg bases this claim on the instruction's reference to the scheme alleged in the indictment, which he contends alleges only a deprivation of intangible rights. While it is true that the indictment contains intangible rights language, we have already determined that other of the indictment's paragraphs allege an offense sustainable under *McNally*. Ginsburg's challenge to this instruction on the ground that it refers back to a defective indictment, therefore must fail.[9]

■ Ginsburg also contends that the second and third instructions fail to pass muster under *McNally*. According to Ginsburg, the instruction defining intent to defraud is defective because it refers unequivocally to "intangible rights" while failing to mention any property right protected by the mail fraud statute. And the definition of scheme to defraud in the third instruction fares no better, according to Ginsburg, because although the instruction

refers to "something of value," this phrase is not further defined. Ginsburg insists that the jury could not have concluded that the scheme resulted in a deprivation of property interests because the indictment and other relevant instructions spoke only in terms of the intangible right to good government and faithful services.

The presence of intangible rights language in jury instructions alone does not warrant relief under section 2255. *E.g.*, *Doe*, 867 F.2d at 989–90 (conviction upheld although instructions contained intangible rights language in its definition of scheme to defraud); *Moore v. United States*, 865 F.2d 149, 153 (7th Cir.1989) (same). Additionally, we have upheld convictions where the scheme to defraud was defined in terms of depriving another of "something of value" by fraudulent means and where the jury was not instructed that only property rights could constitute something of value. *E.g.*, *United States v. Bailey*, 859 F.2d 1265, 1277 (7th Cir.1988), *cert. denied*, 488 U.S. 1010, 109 S.Ct. 796, 102 L.Ed.2d 787 (1989); *Wellman*, 830 F.2d at 1463. The fourth instruction, which sets out a specific example of a scheme clearly falling within the scope of *McNally* (bribery of public officials for favors), also demonstrates the adequacy of the instructions.[10]

■ We must also determine whether the jury necessarily found that Ginsburg was guilty of depriving someone of property; mere possibility that the jury found him guilty of this offense is not sufficient. As the district court correctly observed, the critical question in this case is whether the jury could have found Ginsburg guilty of an intangible rights scheme without also finding him guilty of a scheme to deprive someone of money or property. *Ginsburg I*, 705 F.Supp. at 1321. The district court's thoughtful discussion addressing this inquiry, with which we agree, is worth setting out in full. That court explained:

9. As the government observed, this elements instruction is identical in all essential respects to the elements instruction in *Doe* where we affirmed Gorny's conviction.

10. Ginsburg claims that this instruction does not support his conviction because the instruc-

tion suggests (erroneously, in Ginsburg's view) that the scheme described in the indictment could constitute an offense under *McNally*. Again, because we have already concluded that the indictment alleges an offense under *McNally*, we find Ginsburg's contention unpersuasive.

There was only one way in which County and its citizens were sought to be deprived of honest government—of the honest services of Board employees—and that was by Ginsburg's seeking to subvert the tax assessment system by bribing those people to get favored treatment (that is, lower assessments) for Ginsburg's clients.

To put it simply, if there were indeed a scheme to defraud County and its citizens of intangible rights, it necessarily took the form of a money-or-property deprivation scheme ... [to bribe Board employees to obtain favorable results in the form of fraudulent tax reductions, thus depriving the County and its citizens of money. The deprivation of intangible rights and the money-or-property deprivation] were inextricably intertwined, and the jury could not have found the former without finding the latter beyond a reasonable doubt.

*Id.* at 1321–22.

What is crucial is that the scheme to defraud not be defined in such a way as to allow conviction for conduct that is not an offense.[11] *Wellman,* 830 F.2d at 1463. Here the instructions precluded the jury from finding that Ginsburg participated in a scheme to deprive the County and its citizens of good government and honest services without also finding that he participated in a scheme the purpose of which was to subvert the tax system and thus deprive the County and its citizens of money.[12] We therefore conclude that nothing in the jury instructions entitles Ginsburg to relief under section 2255.

## C. The Evidence at Trial

Finally, Ginsburg contends that the jury was not presented with evidence sufficient to convict him of a scheme to deprive the County and its citizens of money or property. Again, Ginsburg carries a heavy burden. When evaluating a challenge to the sufficiency of the evidence, we " 'review all the evidence and all the reasonable inferences that can be drawn from the evidence in the light most favorable to the government.' " *United States v. Nesbitt,* 852 F.2d 1502, 1509 (7th Cir.1988) (quoting *United States v. Prichard,* 745 F.2d 1112, 1122 (7th Cir.1984)), *cert. denied,* 474 U.S. 1085, 109 S.Ct. 808, 102 L.Ed.2d 798 (1989). A reviewing court must affirm the conviction if *"any* rational trier of fact could have found guilt beyond a reasonable doubt." *United States v. Cosentino,* 869 F.2d 301, 307 (7th Cir.) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original)), *cert. denied,* —— U.S. ——, 109 S.Ct. 3220, 106 L.Ed.2d 570 (1989).

Ginsburg first argues that the jury could not have necessarily found that the mail fraud scheme caused a loss of money or property because the government presented no evidence that he was more successful in obtaining assessment reductions than other attorneys who were not paying bribes to Board officials. According to Ginsburg, this lack of evidence distinguishes his case from *Doe,* where evidence was produced before the jury showing that Stephen Gorny bestowed more favorable treatment on those attorneys from whom he was receiving bribes. Ginsburg claims that in his case a showing of this type of evidence was required to establish a deprivation of property rights.

While the government did present comparative evidence in *Doe,* we did not conclude that offering such evidence was necessary to sustain a conviction under *McNally;* rather we viewed this as one of several factors demonstrating the economic

---

**11.** In his reply brief Ginsburg contends that the cases upon which the government relies are inapposite on the ground that all involved a loss of intangible rights that was inextricably involved with the loss of an economic interest. Because we agree with the district court's characterization of the relationship in the present case between the loss of intangible right to honest government and the loss of the tangible right to tax revenues, we are not persuaded by Ginsburg's argument.

**12.** Ginsburg also contends that another instruction, which stated that the government need not prove all of the acts charged in the mail fraud scheme, could have allowed the jury to convict him under an "intangible rights" theory. The necessary connection between the deprivation of intangible and property rights in this case, however, disposes of this claim as well.

nature of the scheme in which Gorny was involved.[13] In the present case, our review of the record shows that although there was no evidence comparing the success rates of Ginsburg and other attorneys, there was other evidence of the economic nature of the scheme. Such evidence included Erskine's testimony that Ginsburg agreed to pay him a percentage of the legal fees Ginsburg obtained in connection with the scheme to obtain lower tax reductions, and that Ginsburg paid him $18,000 for his part in this scheme. Erskine testified further that he advised Ginsburg to seek larger reductions than he expected to receive for his clients so that Erskine could avoid having always to grant the exact amount sought and that Ginsburg agreed to do so.[14] The jury also heard testimony that Ginsburg was paying hearing officer Jimmie Smith until Erskine told him to stop because he (Erskine) was already paying Smith for his part in the scheme.

More importantly, because the actual success of a scheme to defraud is not required for a mail fraud conviction, *see* cases cited *supra* note 8, it was unnecessary for the government to demonstrate that Ginsburg actually received greater reductions in tax assessments than honest attorneys. The evidence showed that Ginsburg paid bribes to Board officials to obtain lower tax assessments for his clients. How his success rate compared to the success rates of other attorneys who obtained reductions for their clients without bribing Board officials is irrelevant.

Ginsburg also contends that his willingness to prove at trial that the reductions were legitimate as well as the government's failure at trial to question the legitimacy of any particular reduction shows that the government was proceeding under an "intangible rights" theory. To support this claim, Ginsburg seizes upon the following statement in *Ginsburg* I:

At trial Ginsburg's counsel wanted to go through a host of the property assessment files to show that the ultimate results actually obtained could be justified on some legitimate valuation methodology. This Court rejected that evidence as irrelevant to a scheme to deprive County and its citizens of an honestly administered tax assessment system—one free from the presence of Ginsburg's bribes. Of course that response was not tailored to the money-or-property deprivation regime announced only later in *McNally*.

705 F.Supp. at 1322. But again, a scheme to defraud need not be successful to sustain a conviction under the mail fraud statute. The jury in the present case was presented with evidence that Ginsburg paid Board officials to obtain fraudulent tax assessment reductions for his clients. Ginsburg's lack of opportunity to show that the reductions he obtained were somehow justified in spite of his bribes does not establish that he was convicted only under an "intangible rights" theory of mail fraud. Ginsburg claims in effect that his bribery was unnecessary but if so, then that was a mistake he made at the time.

Ginsburg's remaining contentions, which go either to a failure to prove the scheme's actual success or to the weight rather than the sufficiency of the evidence, are without merit.

We conclude that the evidence was sufficient for a reasonable jury to find that Ginsburg was guilty of mail fraud under *McNally*, and therefore the district court's dismissal of his petition for section 2255 relief is

AFFIRMED.

---

13. The record in *Doe* also showed that Gorny did not deny accepting payments from certain attorneys, that his only defense was that these payments were gifts, and that after he received these payments, he overturned earlier Board decisions refusing to reduce tax assessments. *Doe*, 867 F.2d at 990.

14. Ginsburg claims that in an earlier statement to the government, Erskine said that Ginsburg just asked him to work on the files, and that this inconsistency was brought out on cross-examination. This contention, however, goes to the weight rather than the sufficiency of the evidence and does not warrant disturbing the jury's verdict.