**Richard M. PERLMAN and Perlman Marketplace Investors, Plaintiffs,**

v.

**Samuel ZELL, et al., Defendants.**

No. 95 C 4242.

United States District Court, N.D. Illinois, Eastern Division.

July 16, 1996.

William G. Schopf, Jr., Bradley Paul Nelson, John Alton Cashman, Schopf & Weiss, Chicago, IL, for plaintiffs.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Plaintiffs Richard Perlman and Perlman Marketplace Investors (collectively, "Perlman") bring this action against Samuel Zell; over one hundred entities associated with Zell, including a multitude of real estate partnerships; and several individuals associated with Zell and his businesses. Perlman charges that the defendants defrauded him in a variety of ways, primarily by inducing him to invest in certain real estate ventures and then either informing him that his interests in the ventures were illusory or stripping the projects of their value by transferring income or business opportunities to other projects. Perlman alleges that this conduct violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(b)–(d). Perlman also brings several state law claims. The defendants have moved to dismiss the RICO counts (Counts I–III) on a number of grounds, each of which will be discussed below.

## RELEVANT FACTS

The following facts are drawn from the allegations of the complaint, which we take as true for the purposes of a motion to dismiss, *see Mosley v. Klincar*, 947 F.2d 1338, 1339 (7th Cir.1991), and from the plaintiffs' RICO case statement[1] and response brief in opposition to the motion to dismiss. *See Dausch v. Rykse*, 52 F.3d 1425, 1428 (7th Cir.1994) (facts contained in pleadings other than the complaint "are relevant to the extent that they 'could be proved consistent with the allegations.' ").

For about 15 years, from 1976 to 1990, Richard Perlman provided services to Equity Financial and Management Company ("Equity"), a corporation involved in operating and maintaining Samuel Zell's real estate empire, as a senior executive. During this period Perlman invested heavily in Zell's businesses, often at the invitation or urging of Zell or his associates (the individual defendants in this case). In June, 1990, Perlman ceased providing services to Equity. Thereafter, Perlman experienced difficulty in exercising the legal rights associated with some of his investment interests in Zell's businesses, and brought suit to enforce those rights in the Circuit Court of Cook County, Illinois. After obtaining discovery in that case, Perlman filed suit in this court claiming, *inter alia*, RICO violations, common law fraud, breach of fiduciary duty, and breach of contract.

Perlman alleges the existence of six separate fraudulent schemes planned and carried out by the defendants. The first scheme alleges misrepresentations made to Perlman (and others) that induced him to invest in certain of the defendants' ventures. This scheme involved the issuance and sale of securities called "Participation Units" in 86 real estate ventures (referred to collectively as the "Class II partnerships"), over a period from 1983 through 1989. Perlman alleges that the defendants repeatedly misrepresented the value of, and the rights associated with, these Participation Units. As part of this scheme, specified defendants allegedly committed securities fraud and mail fraud.

Perlman portrays the remaining schemes as the manifestations of a continuing desire by the defendants to freeze Perlman out of any involvement with any Zell-related project or entity, and otherwise strip him of his interests in those projects or entities. Some of these schemes involve the general diversion of funds away from "outside" investors to the individual defendants. Most of these schemes took place after Perlman left Equity in 1990.

The second alleged scheme involves the conversion and embezzlement of $360,827 or more in distributions from the Class II partnerships, which Perlman claims should have been paid to him after he left Equity in 1990. The Participation Units allegedly gave Perlman the right to receive such distributions at specified times, including the sale or refinancing of the property for which the Units were issued. Although several sales and refinancing transactions occurred in connection with these properties, Perlman has not received the distributions. Perlman alleges that specified defendants committed mail fraud, wire fraud, and interstate transportation of converted funds in pursuit of this scheme.

The third alleged scheme, which also began after Perlman left Equity, involves the conversion and embezzlement of the distributions due from another group of real estate ventures referred to in the complaint as the "Class I partnerships." The distributions owed to Perlman from these ventures total $1,061,238. The defendants allegedly committed mail and wire fraud in pursuit of this scheme.

The fourth alleged scheme asserts the wrongful seizure and conversion of properties belonging to three partnerships in which Perlman had an interest. The properties allegedly were removed from the partnerships in 1993 and transferred to an entity controlled by Zell so that all of the proceeds of the real estate transactions involving those properties flowed to the defendants, rather than to Perlman and the other "outside" investors. This diversion of funds allegedly resulted in distributions of approximately $19

---

1. As an aid in administering this case, the Court required Perlman to file a RICO case statement, summarizing the complaint's allegations as to the elements of the RICO claims.

million to the defendants and large tax liabilities to Perlman and the other investors. Perlman further claims that the transactions relating to one of these partnerships were falsely "restructured" after the fact in violation of the Internal Revenue Code. Perlman alleges numerous acts of mail fraud and wire fraud in connection with this scheme.

The fifth alleged scheme involves a similar diversion of funds that took place from 1990 through 1994, in which insurance proceeds that should have been paid to various partnerships and/or properties as payment for property damage from fires, floods and other disasters were instead diverted to defendant Rocket Construction Company. The defendants allegedly engaged in several acts of mail fraud as part of this scheme.

The sixth and final alleged scheme was the unauthorized cancellation of Perlman's stock in the law firm formerly known as Rosenberg Perlman & Associates, P.C., now called Rosenberg & Liebentritt, P.C., and a defendant in this lawsuit. This scheme is alleged to have involved two acts of mail fraud.

Perlman alleges that the six schemes demonstrate a continuing pattern of racketeering activity in violation of RICO. The complaint contains three RICO counts: Count I alleges violations of § 1962(c); Count II alleges violations of § 1962(b); and Count III alleges violations of § 1962(d), the RICO conspiracy provision. The defendants have moved to dismiss all three RICO counts for failure to state a claim.

## APPLICABLE STANDARDS

A motion to dismiss tests the sufficiency of the complaint, not the merits of the suit. *Triad Associates, Inc. v. Chicago Housing Auth.*, 892 F.2d 583, 586 (7th Cir.1989), *cert. denied*, 498 U.S. 845, 111 S.Ct. 129, 112 L.Ed.2d 97 (1990). When considering a motion to dismiss, the court views all facts alleged in the complaint, as well as any inferences reasonably drawn therefrom, in the light most favorable to the plaintiff. *Doherty v. City of Chicago*, 75 F.3d 318, 322 (7th Cir.1996). A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim

which would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). In short, the only question is "whether relief is possible under any set of facts that could be established consistent with the allegations." *Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir.1992) (citations omitted).

## ANALYSIS

In their motion to dismiss, the defendants attack the complaint using several broad approaches, arguing that: (1) the claims are barred by the statute of limitations; (2) Perlman has not adequately alleged the necessary predicate acts for RICO; (3) the allegations do not show the necessary pattern of racketeering; and Perlman has failed to properly allege the existence of (4) a RICO enterprise as required for his Count I claim under 42 U.S.C. § 1962(c), or (5) a RICO conspiracy as required for his Count III § 1962(d) claim. We examine each of these areas of attack in turn.

### I. Limitations Period

The defendants' first broad attack is that all of Perlman's RICO claims are time-barred. The limitations period for RICO claims is four years. *Agency Holding Corp. v. Malley–Duff & Assocs., Inc.*, 483 U.S. 143, 156, 107 S.Ct. 2759, 2767, 97 L.Ed.2d 121 (1987). As the complaint was filed on July 21, 1995, the cut-off date for timeliness purposes is July 21, 1991. Any claims that accrued before that date would be barred as untimely, unless the limitations period was tolled.

The limitations period for federal causes of action begins to run (accrues) when the plaintiff discovers, or reasonably should have discovered, that he or she has been injured. *See Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450–51 (7th Cir.1990), *cert. denied*, 501 U.S. 1261, 111 S.Ct. 2916, 115 L.Ed.2d 1079 (1991). Even after the limitations period clock begins to run, it may be stopped under circumstances amounting to either equitable estoppel or equitable tolling. "Equitable estoppel" may exist where the defendant "takes active steps to prevent

the plaintiff from suing in time," such as by promising not to raise the statute of limitations as a defense. *Id.* "Equitable tolling," a separate concept, may apply where the plaintiff is prevented from gaining information that would indicate that the injury was caused by wrongdoing by the defendant. *Id.* at 451.

The defendants assert that most or all of Perlman's claims are untimely because he reasonably should have discovered them well before July 21, 1991. As to Perlman's claims of securities fraud in connection with certain real estate partnerships (the Class II partnerships), the defendants argue that he had been put on notice of his potential claims through documents he received beginning in 1985. As to Perlman's claims of conversion and mail and wire fraud in connection with a $300,000 payment to him, the defendants contend that Perlman should have been aware of these claims no later than 1988. Finally, the defendants argue that most of the remainder of the alleged predicate acts are also time-barred, even if they occurred within the limitations period, because they are merely continuations of the old injuries.[2]

*A.   Timeliness of the Securities Fraud Claims*

Perlman's securities fraud claims relate to the defendants' issuance of "Participation Units" in the Class II partnerships to him in lieu of bonuses and/or compensation for his services.[3] The defendants began issuing the Participation Units to Perlman in 1983, and continued to do so through 1989. After leaving Equity in June, 1990, Perlman was denied partnership rights relating to the Class II partnerships, such as the right of access to books and accounts of the partnerships, and so he filed suit in state court in December, 1992 to enforce those rights. Perlman alleges that it was not until July, 1994 that the defendants told him that the Participation Units he had received conveyed no partner-

ship interests or other legal rights, and thus were essentially worthless.

The defendants argue that, to the extent that Perlman was injured by his purchase of the Participation Units, those injuries accrued long before the timeliness cutoff date of July 21, 1991. First, the defendants note that, beginning in 1985, Perlman received Participation Memoranda containing statements that should have tipped him off that he did not own any true interests in the partnerships. (For example, one such Memorandum states that "the 'Participation Units' entitle the beneficiary to share in the profits or losses of properties without a direct ownership position." Complaint, Ex. A at 2.) We have examined the Participation Memorandum attached to the complaint, and find that its references to ownership interests in the partnerships are at best ambiguous. Even the statement quoted above is ambiguous: while it states that the holder of Participation Units has no "direct ownership" interest in the partnership, it also implies that such a holder does have a property interest of some sort, since he or she is "entitled" to share in profits.

Ambiguous written descriptions of securities interests do not start the limitations period running on a claim sounding in securities fraud. *See McCool v. Strata Oil Co.,* 972 F.2d 1452, 1463 (7th Cir.1992) (holding that ambiguous statements in the first agreement signed by investors would not reasonably alert them to possible fraud, and stating, "we require the sellers of securities to explain themselves in simple, plain language that a reasonable investor can understand."). Especially given the context of a motion to dismiss, in which we view the complaint in the light most favorable to the plaintiff, we do not find that the statements in the Participation Memorandum attached to the complaint were sufficiently clear that they should

---

**2.** The defendants also argued that events occurring in July, 1991 were outside the limitations period, based on the mistaken belief that the complaint was filed on August 3, 1995. They withdrew this particular argument upon realizing their mistake.

**3.** Perlman also alleges he paid cash for some Participation Units in May, 1986. No matter whether he paid cash or merely accepted the Participation Units in exchange for compensation or bonuses that he otherwise would have received, he has alleged that he effectively "purchased" the Participation Units.

reasonably have alerted Perlman to his injury.

■ Second, the defendants point out that Perlman was aware, since 1983, that Zell and his partner Robert Lurie were deliberately understating the values of the Participation Units on the Annual Statements they issued. (Perlman alleges that "[o]n numerous occasions between 1983 and 1990, Zell and Lurie represented to [him] that the values set forth on the Annual Statements were significantly understated, and the actual values were at least twice the amounts reported on the statements." Compl. ¶ 65.) The defendants argue that Perlman knew they were "intentionally misrepresenting" the Units' values, and thus should have suspected some fraud. As Perlman describes Zell's and Lurie's statements in his complaint, however, they are perfectly consistent with an innocent explanation for the discrepancy between written and oral estimates of value—that Zell and Lurie were being appropriately conservative in providing written valuations, while privately believing that the Units were worth much more. In fact, Perlman specifically alleges that Lurie told him from the beginning that "the stated values would be extremely conservative, and that the actual values of the properties and of the participation units would be at least twice the value stated in the annual summaries." *Id.* ¶ 56. On a motion to dismiss, the court views all facts alleged in the complaint, as well as any inferences reasonably drawn therefrom, in the light most favorable to the plaintiff. *Doherty v. City of Chicago*, 75 F.3d 318, 322 (7th Cir.1996). We reject the argument that Zell's and Lurie's private estimates of greater value should have alerted Perlman to some wrongdoing.

■ Finally, the defendants argue that Perlman should reasonably have discovered his injuries by June, 1990, when he left Equity and the defendants began denying him his partnership rights with respect to the Class II partnerships. The complaint does not state the exact date on which the defendants began denying Perlman those rights, however. All that can be gathered from the complaint is that Perlman became suspicious about the management of the Class II partnerships some time between June, 1990 and December, 1992, when he filed suit in state court to enforce his partnership rights. The complaint thus leaves open the possibility that Perlman was not reasonably alerted to the defendants' belief that the Participation Units conveyed no partnership rights until after July 21, 1991. In that case, Perlman's securities fraud claim would have accrued within the limitations period. We are obliged to draw this inference in the plaintiffs' favor when considering a motion to dismiss. *Id.*

Moreover, Perlman alleges that the defendants took additional steps to ensure that he did not discover the true nature of the Participation Units by suggesting that they might buy the Units from him at various times after he left Equity. Compl. ¶¶ 79–82. These ongoing negotiations or "lulling" statements could imply that the Units had value as Perlman had been told, and would justify his delay in realizing the truth. Taking all of the allegations into consideration and drawing the necessary inferences, we find that Perlman's securities fraud claims are not time-barred.

### B. Timeliness of the Claims Related to the $300,000 Payment

■ Perlman alleges that Equity paid Perlman's company Integrated Financial Corporation ("Integrated") $300,000 for Perlman's services in 1988. For tax and accounting purposes, Equity listed the payment on its books as a loan rather than payment for services, but Lurie told Perlman that the "loan" would be written off at some later time and no one would require repayment of the "loan." Integrated accepted the payment for Perlman's services on those terms. Neither Perlman nor Integrated signed a promissory note or other instrument agreeing to repay the money. Equity mailed Integrated invoices showing the loan (and interest on it) beginning in November, 1988. On July 24, 1991, the defendants mailed Perlman the first in a series of letters explaining that the Class I partnerships in which Perlman held interests would be withholding partnership distributions owed to Perlman because the "loan" had not been repaid. Perlman

alleges that the withheld distributions total at least $1,061,238.

The defendants contend that Perlman's mail fraud, wire fraud and conversion claims related to these events are time-barred because the 1988 invoices should have alerted Perlman that the defendants were seeking repayment of the loan. Perlman objects that the invoices were entirely consistent with Lurie's earlier statements to him, and that the invoices could not have alerted him to his eventual injury: the withholding of the Class I partnership distributions that were due to him as recoupment of the "loan" to Integrated. We find that the complaint does not demonstrate any reason why Perlman should have discovered this eventual injury prior to the time that he received the July 24, 1991 letter. Because Perlman filed suit less than four years after he received that letter, these claims were timely filed.

### C. Timeliness of Remaining Claims

The defendants ask that we dismiss Perlman's remaining claims as untimely because they are merely continuations of an injury originally discovered outside the limitations period—the securities fraud related to the issuance of the Participation Units. The defendants have offered almost no explanation of how the other injuries that Perlman claims are related to the securities fraud, however, and our own review of the complaint does not support their argument. Plus, the argument depends on there being an old, untimely injury that produced all the more recent claims. We have held above that neither the claims related to the Participation Units nor the claims related to the $300,000 payment were untimely. It thus follows that even if these older claims gave rise to all of Perlman's other claims, none of the claims are time-barred. In sum, we must reject the defendants' attempt to dismiss Perlman's claims based upon the four-year limitations period.

### II. Predicate Acts

■ The defendants' second broad attack on the complaint is a series of arguments that Perlman has not adequately pled the predicate acts on which a RICO claim rests. A RICO claim generally must conform only to the standards set out in FED.R.CIV.P. 8(a), which require "a short and plain statement of the claim showing that the pleader is entitled to relief." *See Vicom, Inc. v. Harbridge Merchant Servs., Inc.,* 20 F.3d 771, 776 (7th Cir.1994); *see also McLaughlin v. Anderson,* 962 F.2d 187, 194 (2d Cir.1992) (applying Rule 8(a) standard to RICO extortion claim). When the predicate acts upon which the RICO claim is based sound in fraud, however, the plaintiff must comply with the more stringent demands of FED.R.CIV.P. 9(b) and plead the particulars of those acts. *Buck Creek Coal, Inc. v. United Workers of America,* 917 F.Supp. 601, 611 (S.D.Ind.1995).

The predicate acts identified in the complaint include securities fraud, mail and wire fraud, and interstate transportation of converted funds. The defendants claim that, for various reasons, none of these acts is adequately pled.

### A. Securities Fraud

■ As noted above, Perlman's securities fraud claim arises from the defendants' issuance of the Participation Units in the Class II partnerships. The defendants initially claim that the entire securities fraud claim must fail because it is contradicted by another of Perlman's claims.

On one hand, Perlman alleges that misleading statements by the defendants, including representations about the rights and values associated with the Participation Units, caused him to accept the Units in lieu of compensation and bonuses, and thereby caused him loss. On the other hand, Perlman also separately alleges a scheme by the defendants to convert, embezzle, and strip him of the rights and benefits associated with the Participation Units.

The defendants argue that Perlman cannot have it both ways. If the Units conveyed no rights, then Perlman may have a claim for securities fraud but cannot claim that the Units' (nonexistent) value was stripped or converted. If on the other hand the Units did convey the promised rights, then Perlman might have a claim for conversion of the proceeds he was due pursuant to these rights, but not one for securities fraud.

We agree with the defendants that these two sets of allegations appear to be somewhat contradictory, which may ultimately prevent Perlman from recovering on both theories simultaneously. Nevertheless, this does not spell doom for either claim at this point in the case, because the Federal Rules of Civil Procedure permit the pleading of alternate theories of recovery. *See* FED. R.CIV.P. 8(e)(2) ("A party may ... state as many separate claims or defenses as the party has regardless of consistency"). Discovery may show which claim can be supported, or perhaps may uncover facts which would enable both claims to stand without contradicting each other. At this point, however, dismissal of Perlman's securities fraud claims is not warranted because it is not clear that "relief is [impossible] under any set of facts that could be established consistent with the allegations." *Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir.1992). *See McIntosh v. Magna Sys., Inc.*, 539 F.Supp. 1185, 1190–91 (N.D.Ill.1982) (under Rule 8(e)(2), court will not dismiss inconsistent claims at the pleading stage).

█ The defendants also argue that the complaint does not allege all the necessary elements of a securities fraud claim. In his complaint, Perlman identifies several misleading statements made in connection with the issuance of the Units, including: that each Participation Unit represented a share of the ownership or equity in that particular property; that a holder of Units had a right to receive a pro rata share of the equity or profits upon the sale, transfer, or refinancing of the particular property; that the Participation Units were valuable (in Perlman's case, worth up to $1.4 million); and that the holders of the Units were entitled to receive periodic information regarding the partnerships and properties. *See* Compl. ¶ 58.

We find that, in general, Perlman's allegations meet the requirements for securities fraud, which are: a misstatement or omission of material fact, made in connection with a securities transaction, made with the intent to mislead, upon which the plaintiff relied, and which caused the plaintiff loss.

*See Stransky v. Cummins Engine Co., Inc.*, 51 F.3d 1329, 1331 (7th Cir.1995). Defendants contend that the allegations do not plead the first element, a misstatement, because Perlman waffles on whether the defendants' alleged statements were actually false. Instead of affirmatively alleging that the statements were false when made, Perlman states that the defendants recently disclosed that "according to them," the Participation Units did not in fact convey the rights promised earlier. Compl. ¶ 70. Perlman goes on to allege that, *"If, as the defendants now assert,* the participation units do not convey any rights, interests, or benefits ... [they] are virtually worthless." *Id.* ¶ 72 (emphasis added).

We agree that the form of Perlman's allegations of falsity is somewhat indefinite. Essentially, he is saying that *"if* the defendants' current statements are correct, *then* the Units never had any value, and so the defendants' statements were false when made." We consider this "if, then" format to be a variety of pleading in the alternative, which Perlman appears to believe is necessary in order to avoid making a possible judicial admission that would foreclose his claims that the defendants converted his proceeds from the Participation Units. Perlman's fears here are groundless: allegations made in support of alternative pleadings are not to be construed as admissions. *See Douglas Equip., Inc. v. Mack Trucks, Inc.*, 471 F.2d 222, 224 (7th Cir.1972); *Continental Ins. Co. v. Sherman*, 439 F.2d 1294, 1298 (5th Cir. 1971). Nevertheless, requiring Perlman to replead this allegation in a more assertive form would be a waste of resources.[4] We will allow Perlman's locution as to falsity to stand, but will read it as affirmatively alleging the falsity element.

The defendants also attack the adequacy of the allegations of other elements of securities fraud besides falsity. They argue that there can be no reasonable reliance by Perlman on any of their representations, because Perlman was being willfully blind to information that should have raised questions about the legal rights attached to the Participation

---

4. The defendants do not complain that they are unable to discern the substance or details of the

securities fraud claim against them, only that the allegation of falsity is phrased as a contingency.

Units. Here, the defendants raise many of the same arguments discussed earlier in the context of the statute of limitations, claiming that the plain language of the documents Perlman received should have alerted him that his reliance on the defendants' oral statements was unreasonable. We reject those arguments in this context as well, for the reasons we gave before.

■ The defendants additionally contend that the fact that Perlman was not a party to any partnership agreements and did not receive a deed or other writing evidencing the ownership of land (as arguably required by the Statute of Frauds) should have signalled that he had no partnership or ownership interests in the properties. As to the lack of partnership agreements, Perlman responds that he was told that the Participation Units were different than traditional partnership interests, and thus he had no reason to believe that partnership agreements would be necessary. As for the Statute of Frauds, Perlman argues that he did receive "writings" documenting his interests in the properties, in the form of the Participation Memoranda and Annual Statements.

Viewing the complaint and the exhibits thereto in the light most favorable to the plaintiff, we find that there is nothing in them that forecloses the possibility of reasonable reliance on the statements allegedly made by the defendants, even where the investor is a sophisticated attorney such as Perlman. Taken together, the allegations of the complaint paint the picture of a real estate empire in which it was not unusual for investments to be structured in a complex manner, but in which investors need not have been on guard against deliberate misrepresentations regarding the rights conveyed in exchange for their investments. We of course express no opinion upon whether the evidence ultimately adduced will support this picture. At this point, however, we find no irreconcilable contradictions in the picture, and thus must credit it. We do not find that Perlman's reliance on the defendants' statements was unreasonable as a matter of law.

■ The defendants next contend that Perlman has no cause of action as to any representations that investors would receive regular reports on the status of their Participation Unit investments. They argue that such statements are promises of future action, which are not actionable unless they are part of a "scheme to defraud." *See Bower v. Jones*, 978 F.2d 1004, 1011 (7th Cir.1992). They also contend that the eventual breach of their promise (the complaint admits that Perlman did receive reports for six years) could not in itself have caused Perlman any injury.

We agree that the mere promise to provide regular reports in the future would not be actionable in these circumstances. The breach of such a promise sounds in contract, not fraud: the fact that the defendants actually issued reports for several years negates any inference that the defendants did not intend to perform at the time they made the promise. *See Price v. Highland Community Bank*, 722 F.Supp. 454, 459–60 (N.D.Ill.1989) ("A change of mind can be ... a breach of contract, but it is not fraud."), *aff'd*, 932 F.2d 601 (7th Cir.1991). Moreover, to prove promissory fraud, a plaintiff must show that the promise was not carried out. *See Consolidated Bearings Co. v. Ehret–Krohn Corp.*, 913 F.2d 1224, 1227 (7th Cir.1990). Perlman's allegations state that the promise *was* carried out, at least for several years.

We believe, however, that the complaint does not allege that the defendants made a promise of future action, but instead alleges a misrepresentation of present fact: that the Participation Units gave their holders the present right to regular information about the Units. *See* Compl. ¶ 58(h) (defendants stated that "holders of the participation units were entitled to receive periodic information ... regarding the partnerships and the properties"). Because the allegation describes a statement of present fact rather than a promise of future action, the rule governing promises of future performance does not apply.

Moreover, Perlman has adequately alleged a causal link between the alleged misstatement and his losses. Perlman alleges that the defendants told him (among other things) that the Units carried the right to regular information about their status and value, in

order to induce him to accept Units in lieu of compensation that was due him. Although not directly stated, it is a reasonable inference that Perlman would not have accepted the Units had he known that he had no right to receive information about the profits generated by the Units' properties. The defendants now claim that the Units do not have such rights associated with them, and Perlman alleges that the Units are essentially worthless. In addition, Perlman argues that the lack of access to information about the management of the Units' assets allowed the defendants to conceal their conversion and embezzlement of those assets. It is thus possible that a false statement about the availability of information about the Units could have caused Perlman loss.

■ Last, the defendants assert that Perlman's securities fraud claim must fail because the defendants' alleged statements that the Participation Units were "extremely valuable" were merely statements of opinion. In *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1093–95, 111 S.Ct. 2749, 2758–60, 115 L.Ed.2d 929 (1991), the Supreme Court held that statements of opinion may form the basis for securities fraud claims under certain circumstances: where the speaker knows that the facts do not support the opinion stated, or where the opinion is "misleadingly incomplete." Other courts have also held that "the securities laws are clearly implicated if [the defendant] intentionally or recklessly omits certain facts contradicting [its] statements," even where those statements are opinions. *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir.), *cert. denied*, 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992); *see also United States v. Morris*, 80 F.3d 1151, 1163–65 (7th Cir.1996) (collecting and discussing cases from several circuit courts of appeal).

Perlman alleges that the defendants "knew that their representations regarding the participation units were false and misleading at the time they were made." Compl. ¶ 74. This statement must be read to allege that the defendants knew there was no basis for their estimations of the Participation Units' value. Under *Sandberg* and *Morris*, this allegation is sufficient to state a claim.

We thus reject all of the defendants' arguments regarding the adequacy of Perlman's securities fraud claim. At this point in time, we conclude that this claim is properly pled, and that it may serve as a basis for Perlman's RICO claims.

### B. Mail Fraud and Wire Fraud

Perlman alleges that all of the fraudulent schemes outlined in his complaint involved mail fraud, and often wire fraud as well. The defendants have attacked the adequacy of his allegations of mail and wire fraud for all of these schemes, arguing that for various reasons they do not state a claim and thus may not serve as predicate acts for the RICO claims. We examine the allegations and arguments relating to each scheme separately.

### 1. Mail Fraud in Securities Fraud Scheme

As discussed earlier, Perlman claims that the issuance of Participation Units in the Class II partnerships between February 1983 and the end of 1989 constituted securities fraud. He further alleges that three letters sent in 1991 and 1992 constituted mail fraud, in pursuit of the same fraudulent scheme. The first two letters, dated July 24, 1991 and June 24, 1992, discussed the possibility that Zell would purchase the Participation Units from Perlman. The last letter, sent on September 10, 1992, contained a distribution from the sale of one of the properties in which Perlman believed he had an interest through the Participation Units.

In order to state a claim for mail fraud under 18 U.S.C. § 1341, or wire fraud under 18 U.S.C. § 1343, a plaintiff must allege (1) participation by the defendant(s) in a scheme to defraud, and (2) use of the mails or interstate telephone lines in furtherance of the fraudulent scheme. *See Schmuck v. United States*, 489 U.S. 705, 721, 109 S.Ct. 1443, 1453, 103 L.Ed.2d 734 (1989) (mail fraud); *United States v. Richman*, 944 F.2d 323, 332 (7th Cir.1991) (mail and wire fraud). The defendants contend that, because the letters at issue here were sent after they had issued the Participation Units to Perlman (the last Units were issued to Perlman in 1989), the

letters cannot be considered part of the fraudulent activity.

■ Mail and wire fraud require more than the mere use of the mails and interstate wire systems; for each violation, the act must be in furtherance of the scheme to defraud. *United States v. Koen*, 982 F.2d 1101, 1107 (7th Cir.1992). Earlier in this century, the Supreme Court held that a mailing that occurred after the scheme reached fruition was not chargeable because the fraudulent scheme was already complete. *See Kann v. United States*, 323 U.S. 88, 94, 65 S.Ct. 148, 150–51, 89 L.Ed. 88 (1944). In *United States v. Sampson*, 371 U.S. 75, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962), however, the Court disclaimed establishing any hard rule that "a deliberate, planned use of the mails after the victims' money had been obtained can never be 'for the purpose of executing' the defendant's scheme." *Id.* at 80, 83 S.Ct. at 176. Thus, if the purpose of the later mailings is to execute or further the defendant's fraudulent scheme, such mailings may serve as the basis for a claim of mail fraud.

■ The Seventh Circuit likewise has held that subsequent mailings can, in some circumstances, be chargeable under the mail fraud statute. These circumstances exist when a subsequent mailing is designed to lull the victims into a false sense of security or conceal the misconduct that has occurred. *See, e.g., United States v. Brocksmith*, 991 F.2d 1363, 1367 (7th Cir.1993) (postcard sent by an agent to put victims at ease about delays in receiving their policies was chargeable as mail fraud even though the agent had already received the victims' money).

In the present case, the securities fraud itself ended in 1989 when the last Participation Units were issued to Perlman. The letters were sent after this, in 1991 and 1992. Perlman alleges, however, that the letters were intended to (and did) conceal the falsity of the defendants' previous representations concerning the Participation Units, lulling Perlman into continuing to believe that he had purchased valuable securities in the various Class II partnerships and properties. The letters are alleged to have included negotiations concerning the re-purchase of the Units, as well as a distribution from one property for which Units Perlman held Units. Such letters could have furthered the scheme to defraud, even though they were sent subsequent to the issuance of the securities themselves. Perlman has adequately alleged that the mailings violated the mail fraud statute.

2. Scheme to Convert Class II Sale and Refinancing Proceeds

■ The second scheme alleged by Perlman states that, after fraudulently inducing Perlman to acquire Participation Units in the real estate ventures managed by the Class II partnerships, several of the defendants engaged in a systematic scheme to refinance, sell, and transfer most of the properties and liquidate the partnerships without paying Perlman any share of the resulting proceeds or distributions. Perlman alleges that between approximately 1991 and 1995, Zell and two of his entities caused the Class II partnerships to sell at least 59 of their properties. The majority of the sales were made in connection with two real estate investment trusts ("REITs") established by Zell. Perlman also alleges that the same defendants also caused the Class II partnerships to refinance at least 40 properties in which Perlman owns Participation Units between approximately 1989 and 1995. Perlman alleges that despite his ownership of Participation Units, various defendants converted all of the sale and refinancing proceeds to themselves and their affiliates, and that he has never received any distributions from those proceeds.

Perlman alleges that the defendants committed mail and wire fraud in several ways in pursuit of this scheme. First, he alleges that the defendants made misrepresentations in various documents and letters submitted to purchasers, lenders, title companies, underwriters, investors, and others involved in the transactions, primarily by failing to disclose the existence of the Participation Units issued to Perlman and others, which represented equity interests in the various Class II properties. Compl. ¶¶ 98–99. This silence caused the various third parties to transact business with the defendants without taking the interests represented by the

Participation Units into account. *Id.* ¶ 100. Perlman alleges that the defendants knew that their representations were false and misleading, and intended them to induce these third parties to allow the various sale and refinancing transactions to proceed. *Id.* ¶¶ 100–01. Perlman alleges that the defendants falsely represented to third parties that the sales to the REITs were properly authorized by the respective partnerships, when in fact the partnership agreements prohibited such transactions. *Id.* ¶¶ 103–05.

Perlman next alleges that the defendants transmitted fraudulent amendments to various partnership agreements improperly authorizing the transfer of properties to the REITs, via the mails and wire systems. *Id.* ¶¶ 116–18. The actual proceeds of the sales and refinancings were then transmitted to certain defendants, who received them in trust and embezzled them. *Id.* Last, Perlman alleges that certain other mailings allowed the defendants to conceal the sales and refinancing transactions, and also their receipt and conversion of distributions that should have been paid to Perlman. *Id.*

The defendants first argue that Perlman cannot state a claim for mail or wire fraud because the alleged misrepresentations were made to third parties, not Perlman. The defendants also argue that these misrepresentations did not themselves deprive Perlman of property. They claim that the alleged misrepresentations were made in furtherance of refinancing and sales transactions, not in furtherance of a scheme to convert Perlman's distributions.

In *SJ Advanced Tech. & Mfg. Corp. v. Junkunc*, 627 F.Supp. 572, 576 (N.D.Ill.1986), the court held that misrepresentations to third parties may violate the mail fraud statute. The court implicitly recognized that there must be some type of nexus between the fraudulent misrepresentations to third parties and the actual plaintiff. The court held that such a nexus existed there, where the goal of the defendant's misrepresentations to third parties was to advantage itself competitively in a manner that injured the plaintiff. *Id.* The statements to third parties were thus a cause of the plaintiff's injuries.

In the present case, the misrepresentations to the various third parties—financial institutions, buyers, and others whose involvement was necessary to the transactions—are similarly related to the plaintiff's injury. The misrepresentations were made to induce sales and refinancing transactions which on their face were not aimed at injuring Perlman. Perlman has alleged, however, that the misrepresentations were the first step in the defendants' scheme to defraud him, and that the ultimate purpose of the manner in which the transactions were conducted was to put money in the defendants' pockets at the expense of Perlman and other investors. Seen in this light, the sales and refinancing transactions were a necessary part of the scheme to convert the Class II sale and refinancing proceeds, and the misstatements to the third parties enabled those transactions to be consummated. This is a sufficient causal link under *SJ Advanced.*

■ Apart from the misrepresentations made to third parties, the other acts of embezzlement and conversion that Perlman alleges as part of this scheme are also prohibited by the mail and wire fraud statutes. *See Carpenter v. United States*, 484 U.S. 19, 27, 108 S.Ct. 316, 321, 98 L.Ed.2d 275 (1987) (for mail fraud purposes, "fraud" "includes ... embezzlement, which is the 'fraudulent appropriation to one's own use of the money or goods intrusted to one's care by another'") (quoting *Grin v. Shine*, 187 U.S. 181, 189, 23 S.Ct. 98, 102, 47 L.Ed. 130 (1902)); *Appley v. West*, 832 F.2d 1021, 1027–28 (7th Cir.1987) (mailings in furtherance of conversion of funds constitute mail fraud); *Heritage Ins. Co. v. First Nat'l Bank*, 629 F.Supp. 1412, 1416 (N.D.Ill.1986) (allegations of false statements coupled with diversion of funds state a claim of mail fraud). In the present case, Perlman alleges that the defendants used the mails and wire systems to misappropriate his shares of the partnership distributions and proceeds, and to convert and embezzle those funds. Taken in the overall context of the complaint, these allegations are sufficient to make out a claim for mail fraud.

■ Finally, Perlman alleges that the defendants owed him a fiduciary obligation. If

so, the nondisclosure and acts of concealment that he has alleged also may constitute mail and wire fraud. *See United States v. Dial,* 757 F.2d 163, 168 (7th Cir.) (the deliberate concealment of material information in a setting of fiduciary obligation can violate the mail and wire fraud statutes), *cert. denied,* 474 U.S. 838, 106 S.Ct. 116, 88 L.Ed.2d 95 (1985); *United States v. Dick,* 744 F.2d 546, 550 (7th Cir.1984) ("This court has recognized that breach of a fiduciary duty to disclose information ... can support a mail fraud conviction.") (citing *United States v. Feldman,* 711 F.2d 758, 763 (7th Cir.), *cert. denied,* 464 U.S. 939, 104 S.Ct. 352, 78 L.Ed.2d 317 (1983)). Even where there is no fiduciary duty, "a misleading omission is actionable as part of a scheme to defraud 'if it is intended to induce a false belief and resulting action to the advantage of the misleader and the disadvantage of the misled.'" *United States v. Morris,* 80 F.3d 1151, 1161 (7th Cir.1996) (quoting *Emery v. American Gen. Fin., Inc.,* 71 F.3d 1343, 1348 (7th Cir.1995)). Perlman has alleged that the defendants made misleading omissions with the intention of ultimately benefitting themselves at the expense of Perlman and other investors. Accordingly, under all of these cases, he has adequately alleged mail fraud in connection with this scheme.

### 3. Scheme to Convert Class I Partnership Distributions

■ Perlman alleges that since he left Equity in June 1990, various defendants have engaged in an ongoing scheme to fraudulently convert more than $1 million in distributions that should have been paid to Perlman from the Class I partnerships. This conversion has been allegedly perpetrated through various false representations and pretenses, including the pretense that Perlman is indebted to B/S Investments for a loan in the amount of $300,000. Perlman alleges that the defendants used this pretense of a $300,000 loan to cause Equity and the Class I partnerships to withhold all distributions that should have been paid to him. The complaint also alleges that the mails were utilized in carrying out this scheme: Perlman was sent invoices falsely characterizing the $300,000 payment as an outstanding loan,

and received letters stating that his distributions were being withheld on account of this false "debt." Perlman also alleges that the defendants mailed a verified pleading in the state court action which falsely stated that the $300,000 was a loan which Perlman was obligated to repay.

The defendants claim that the mail fraud claims are deficient because there was no scheme to defraud—Perlman has not alleged any actual deception here. The defendants rely on *McDonald v. Schencker,* 18 F.3d 491, 495 (7th Cir.1994), in which the court held that the alleged conversion of funds and subsequent mailings surrounding that event did not constitute mail fraud because there were no acts of deceit or chicanery on the part of the defendant. There, the defendant (an attorney) simply told the plaintiff (a former client) that he was going to apply the plaintiff's escrow funds to an unpaid legal bill. There were no allegations that the defendant intended to defraud the plaintiff. The court held that this openly stated plan, standing alone, was not a "scheme to defraud" within the meaning of the mail fraud statute. *Id.*

"Scheme to defraud," as that term is used in the mail and wire fraud statutes, "describes a broad range of conduct, some [types] which involve false statements or misrepresentations of fact, and others which do not." *United States v. Doherty,* 969 F.2d 425, 429 (7th Cir.), *cert. denied,* 506 U.S. 1002, 113 S.Ct. 607, 121 L.Ed.2d 542 (1992) (citations omitted).

> The plain meaning of "scheme" is a "design or plan formed to accomplish some purpose," Black's Law Dictionary 1344 (6th ed. 1990), or "a plan, design, or program of action to be followed." The Random House College Dictionary 1177 (rev. ed. 1980). To "defraud" means "[t]o practice fraud," "to cheat or trick," Black's, *supra,* at 483, or "to deprive of a right or property by fraud," Random House, *supra,* at 349; "fraud" means "deceit, trickery, or breach of confidence, used to gain some unfair or dishonest advantage." *Id.* at 526.

*Id.* at 428. Here, Perlman has alleged that the defendants planned to use the mischaracterization of the $300,000 payment as a loan

in order to cheat him by inducing Equity and the Class I partnerships to withhold partnership distributions that were owed to him. Compl. ¶¶ 128–35. We believe that these allegations—which depict cheating someone through a plan involving false statements— meet all the above requirements of a scheme to defraud.

"As we [the Seventh Circuit] have recently had occasion to explain in a civil RICO suit, the mail and wire fraud statutes broadly apply to any scheme 'where in order to get money or something else of monetizable value from someone you make a statement to him that you know to be false, or a half truth that you know to be misleading, expecting him to act on it to your benefit and his detriment.'" *United States v. Morris,* 80 F.3d at 1160 (quoting *Emery v. American Gen. Fin., Inc.,* 71 F.3d at 1346).

Nor is there any requirement that the scheme must have actually fooled Perlman in order to be actionable as mail fraud. The Seventh Circuit "has reiterated on numerous occasions that the ultimate success of the fraud and the actual defrauding of a victim are not necessary prerequisites to a successful mail fraud prosecution." *United States v. Bucey,* 876 F.2d 1297, 1311 (7th Cir.) (citations omitted), *cert. denied,* 493 U.S. 1004, 110 S.Ct. 565, 107 L.Ed.2d 560 (1989). Indeed, here Perlman has alleged that the scheme *was* successful, in that his partnership distributions were withheld from him and he has yet to receive them. We find that Perlman has adequately pled mail fraud in connection with the alleged scheme to convert the Class I partnership distributions.[5]

### 4. Scheme to Defraud Involving the Apartment REIT

■ Perlman also alleges that certain defendants engaged in several schemes to defraud Perlman and others in connection with a real estate investment trust known as the Apartment REIT. Zell and other defendants allegedly engaged in a fraudulent scheme to seize three apartment complexes—Four Lakes Village, Olentangy Commons, and Lake in the Woods Apartments— from the limited partnerships which owned those complexes, so that the properties could be sold to Zell's Apartment REIT at a profit and the proceeds diverted to Zell and his affiliates.

The complaint states that the scheme was carried out, in part, through false mailings to limited partners stating that there was no alternative but to allow the partnerships to default on purchase contracts of the apartment complexes. *See* Compl. ¶ 150 & Ex. C. These letters were false and misleading, in that they failed to disclose that Zell was in the process of forming a REIT in which these properties would be consolidated and sold to the public through a $300 million public offering. *Id.* ¶¶ 151–54. Perlman had direct and indirect interests in Four Lakes, Olentangy, and Lake in the Woods, and alleges that he was injured as a result of the above scheme. *Id.* ¶ 162. The complaint sets forth numerous acts of mail fraud and two acts of wire fraud in connection with this alleged fraudulent scheme.

The defendants attack these the allegations of mail and wire fraud in connection with this scheme on the grounds that at most they merely state a claim for garden variety breach of fiduciary duty. If the allegations also state a claim for mail and wire fraud, however, they may form the basis for a RICO claim regardless of whether they describe a breach of fiduciary duty. In addition, a breach of fiduciary duty itself may be considered fraud. In *United States v. Dial,* 757 F.2d 163 (7th Cir.), *cert. denied,* 474 U.S. 838, 106 S.Ct. 116, 88 L.Ed.2d 95 (1985), the court held that a mail fraud claim can be based on material omissions: "Fraud in the common law sense of deceit is committed by

---

5. The defendants did not raise any argument regarding the second requirement for mail fraud: that the mailings must have furthered the execution of the scheme. We have examined the pleadings in this regard and have determined that, although Perlman does not expressly state how the mailings furthered the scheme, it is possible to infer that mailings were somehow involved in the inducement of Equity and the Class I partnerships to withhold distributions. Nevertheless, we caution Perlman that the allegations are far from clear in this regard, and that he will have to show a definite causal link between the mailings and his loss in order for these claims to survive at trial.

deliberately misleading another by words, by acts, or, in some instances—notably where there is a fiduciary relationship, which creates a duty to disclose all material facts—by silence." *Id.* at 168. *See also United States v. Morris,* 80 F.3d at 1161 (misleading omissions are actionable as mail fraud if intended to induce action that would harm the plaintiff). Perlman has alleged that the defendants withheld material information bearing on the transactions involving the three properties, and that these omissions harmed him. He thus has alleged fraud under *Dial* and *Morris.* Having adequately alleged a scheme to defraud and use of the mail and wire in furtherance of this scheme, Perlman has sufficiently pled mails and wires fraud.

▆▆ The defendants next argue that their silence about the transfers to the REIT did not cause Perlman's losses because Perlman could not have stopped the transfer of the properties even if he had known the truth. The defendants attempt to find a safe harbor where none exists. Perlman need only allege that the defendants' silence caused him harm, and he has done that here. Compl. ¶ 162. He need not plead more at this point. "A suit should not be dismissed if it is possible to hypothesize facts, consistent with the complaint, that would make out a claim." *Graehling v. Village of Lombard,* 58 F.3d 295, 297 (7th Cir.1995) (citing *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232–33, 81 L.Ed.2d 59 (1984)). It is certainly possibly to hypothesize facts consistent with the complaint which would suggest that, had he known the true situation, Perlman could and would have taken steps to protect his interests. As only one example, Perlman might have sought to obtain an injunction to stop the transactions from proceeding. At this stage in the case, we cannot grant the defendants the benefit of the assumption that the information they are alleged to have withheld from Perlman could never have been used to prevent or lessen the losses he claims. We thus find that the allegations of mail and wire fraud related to these transactions state a valid claim.

5. Tax Fraud in the Restructuring of Four Lakes

▆▆ Perlman alleges that, after wrongfully transferring the Four Lakes property, the defendants designed a fraudulent tax scheme restructuring the Four Lakes transaction so as to postpone the tax liabilities of Zell's seizure and sale of that property. The tax restructuring of Four Lakes was accomplished through a series of documents which, according to the complaint, were executed in early 1994, but which were backdated to October 21, 1993. These documents purportedly modified and rescinded contracts, agreements, and property transfers that had been executed and finalized months earlier. Perlman alleges that this tax scheme not only reduced the adverse tax consequences of the cancellation of Four Lakes purchase contract but furthered the overall scheme of defrauding the limited partners of Four Lakes by perpetuating the diversion of millions of dollars in proceeds. In furtherance of this alleged fraudulent tax scheme, defendants made use of the mails and transmitted by wire numerous documents, letters, and conversations.

The defendants first claim that there are no allegations that they made any fraudulent representations relating to this scheme. This is plainly untrue: at a minimum, Perlman alleges that many of the documents were falsely backdated. *See* Compl. ¶¶ 166–69. The defendants next argue that Perlman has not alleged how he was injured in any way by this restructuring. In examining the complaint, however, we find that Perlman has alleged that the restructuring, and the mailings in furtherance of the restructuring, were performed to conceal from him and other investors the fact that defendants had engaged in fraud (in transferring the properties to the Apartment REIT), and to further that fraud by softening the immediate tax consequences for the investors. *See id.* ¶¶ 163–73. Courts have recognized that the concealment of fraud, and mailings in furtherance of such concealment, are covered by the mail and wire fraud statute. *See Appley v. West,* 832 F.2d 1021, 1027–28 (7th Cir. 1987) (mailings used to conceal scheme to defraud through conversion of funds constitute mail fraud); *United States v. Brocksmith,* 991 F.2d at 1367 (mailing designed to put victims at ease about delays in receiving

policies was chargeable under mail fraud statute). The restructuring scheme, and the mailings related to it, allegedly perpetuated and contributed to the harm suffered by the investors from the underlying scheme. The claims of mail and wire fraud in connection with this scheme therefore must stand.

### 6. Scheme to Divert Funds to Rocket Construction Company

The complaint alleges that Zell and other defendants engaged in a scheme to divert over $1 million in funds from various partnerships and their properties to defendant Rocket Construction Company, a company set up and owned by Zell and related parties. The diverted funds consisted of insurance proceeds that should have been paid to the partnerships and properties. Perlman claims that Zell and other defendants failed to disclose to the other partners in these defendant partnerships that insurance funds were being paid and diverted to Rocket. Perlman alleges that as fiduciaries and general partners, these defendants had a duty to disclose the payments. As a result of these diversions of funds, Perlman claims that the value of his investments, and the partnership proceeds and distributions available to him, were diminished.

The defendants claim that there was no misrepresentation or deceit in connection with the payments to Rocket, so Perlman has no mail fraud claim. However, courts have repeatedly held that the conversion or diversion of funds, especially when it is concealed, can constitute mail or wire fraud. *See United States v. Wallach,* 935 F.2d 445, 463–64 (2d Cir.1991) (scheme to divert corporate funds to insiders violates the mail fraud and RICO statutes); *Appley,* 832 F.2d at 1027 (concealed conversion of funds violates mail fraud statute); *Graham v. Slaughter,* 624 F.Supp. 222, 223 (N.D.Ill.1985) (embezzlement of funds via mail and wire transfers was mail fraud). *See also United States v. Doherty,* 969 F.2d 425, 429 (7th Cir.1992) (not all acts of mail fraud must involve misrepresentations). Perlman alleges that funds were improperly diverted, and that the defendants concealed the payments to Rocket

from outsiders. The scheme alleged here thus falls within the mail fraud statute.

### 7. Scheme to Convert Perlman's Rosenberg Liebentritt Stock

Finally, Perlman claims that as part of the general scheme to strip him of his interest in all Zell-related entities, certain defendants defaced the stock certificate which represents Perlman's 40% share of Rosenberg Liebentritt stock by marking the word "canceled" across the front of the certificate. The defendants then issued Perlman's shares of stock to themselves. The complaint alleges that Perlman never sold, assigned, transferred, or consented to the sale, assignment, or cancellation of his shares in Rosenberg Liebentritt. Perlman alleges that the mailing of the defaced stock certificate to him, and the mailing of a January 24, 1992 letter to him that falsely stated that his stock was canceled in his presence and with his consent, constitutes mail fraud.

In their motion, the defendants again rely on the argument that there was no scheme to defraud because there was no deception—Perlman was not fooled into believing that his stock had been legitimately canceled. As discussed above, this argument is meritless: the ultimate success of the deception is not a requirement for a charge of mail or wire fraud. *See United States v. Richman,* 944 F.2d at 332 (citing cases).

A more fundamental problem with the mail fraud claims alleged here is that the two mailings do not appear to have furthered the scheme to defraud. The mailing of the defaced stock certificate to Perlman did not further the scheme, because the scheme reached completion once the defendants canceled the stock and reissued the shares to themselves. *See generally United States v. Bonansinga,* 773 F.2d 166, 170 (7th Cir.1985) (a mailing is not in furtherance of a scheme if the scheme has already reached fruition at the time of the mailing), *cert. denied,* 476 U.S. 1160, 106 S.Ct. 2281, 90 L.Ed.2d 723 (1986). Neither that mailing nor the letter of January 24, 1994 furthered the defendants' misconduct in any way—unlike other mailings discussed in this Opinion that were sent after the scheme reached fruition, the mail-

ings here did not serve to "lull" Perlman's suspicions or conceal the defendants' wrongdoing. Indeed, the mailings actually announced that wrongdoing. Although Perlman states generally that "the mailings were ... done to further the overall scheme to defraud" Perlman of his interests in Zell-related entities, the specific allegations describing the stock cancellation refute this conclusion. In the event of a conflict, specific factual allegations control over general allegations that state legal elements, and if a plaintiff pleads particulars that show he has no claim, then he has pleaded himself out of court. *Thomas v. Farley*, 31 F.3d 557, 558 (7th Cir.1994).

We find that the allegations relating to the Rosenberg Liebentritt stock cancellation do not state a claim for mail fraud, and thus may not serve as predicate acts for RICO purposes. Any claims Perlman has in connection with these events must be brought under non-RICO theories.

In sum, after careful consideration of all of the defendants' arguments with regard to the various acts of mail and wire fraud that are alleged, we find that all of the alleged acts state valid claims and may serve as RICO predicate acts, with the exception of the alleged acts of mail fraud related to the cancellation of Perlman's Rosenberg Liebentritt stock.

## C. Interstate Transportation of Improperly Obtained Funds

The final predicate acts alleged by Perlman to support his RICO claims are the related crimes of interstate transportation of improperly obtained funds and receipt of such funds. The former punishes anyone who "transports, transmits, or transfers in interstate ... commerce any ... money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud...." 18 U.S.C. § 2314 (1996). The latter statute is addressed to anyone who "receives, possesses, conceals, stores, ... or disposes of" such funds, "knowing the same to have been stolen, unlawfully converted, or taken...." 18 U.S.C. § 2315 (1996). Perlman alleges that the defendants unlawfully took the distributions from the Class II

partnerships which should have been paid to him as a result of various refinancings and sales, and instead paid these monies to themselves in such a manner that the funds were sent across state lines into the defendants' accounts.

The defendants challenge the allegations of these predicate acts as not being pled in sufficient detail. Specifically, they argue that when §§ 2314 and 2315 are the basis of a RICO claim, they must meet the pleading requirements of FED.R.CIV.P. 9(b), and that the allegations here do not do so because they fail to state specifically where and when state boundaries were crossed and how much the transported proceeds were worth. The defendants also argue that Perlman failed to properly plead that the funds in question were converted or fraudulently obtained. They argue that Perlman has not made out a claim that the funds were converted because in order to state a claim for conversion under Illinois law, the source of the funds must be specifically identified. Nor has Perlman adequately alleged that the funds were fraudulently obtained, they claim, for the same reasons they identified above in challenging the mail and wire fraud claims.

To take the latter argument first, we find that Perlman has adequately pled that the funds were converted or fraudulently obtained. Federal common law, rather than state law, defines "conversion" and governs the elements to be pled. *See United States v. Turley*, 352 U.S. 407, 411, 77 S.Ct. 397, 399, 1 L.Ed.2d 430 (1957) (interpreting the meaning of the "stolen, converted or taken by fraud" requirement of § 2314, and holding that, "in the absence of a plain indication of an intent to incorporate diverse state laws into a federal criminal statute, the meaning of the federal statute should not be dependent on state law."). In the context of §§ 2314 and 2315, "[t]he words 'stolen, converted, or taken by fraud' have been construed to encompass virtually all ways by which an owner is wrongfully deprived of the use of his property." *United States v. Gullett*, 713 F.2d 1203, 1210 (6th Cir.1983) (citing cases), *cert. denied*, 464 U.S. 1069, 104 S.Ct. 973, 79 L.Ed.2d 211 (1984). *See also Turley*, 352 U.S. at 417, 77 S.Ct. at 402 (as used in

§ 2314, the meaning of "stolen" is not limited to common law larceny); *United States v. Pre–Columbian Artifacts*, 845 F.Supp. 544, 546 (N.D.Ill.1993) (the term "stolen," as used in §§ 2314 and 2315, is not a term of art but is instead "broad in scope with 'wide-ranging meaning'") (citations omitted). Thus, Perlman need not plead the specific elements of conversion under Illinois law. Under federal common law, the requirement that the funds be alleged to have been "stolen, converted or taken by fraud" is satisfied by Perlman's allegations that the defendants wrongfully transferred and kept for themselves proceeds from the Class II partnership refinancings and sales that should have been paid to him.

■ The defendants' remaining argument, that the "what, where, when, and how much" of each actual transportation of funds must be pled with particularity, merits a more extensive discussion. Generally, RICO complaints are governed by FED.R.CIV.P. 8(a)(2), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." *See Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 776 (7th Cir.1994). Federal Rule of Civil Procedure 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." FED.R.CIV.P. 9(b). In RICO cases, this means that "the complaint must, at a minimum, describe [fraud-based] predicate acts with some specificity and 'state the time, place, and content of the alleged communications perpetuating the fraud.'" *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1020 (7th Cir.1992) (quoting *Graue Mill Dev. Corp. v. Colonial Bank & Trust Co.*, 927 F.2d 988, 992 (7th Cir.1991)).

■ Allegations of the violation of §§ 2314 and 2315 do not, in and of themselves, constitute allegations of fraud that must be pled with specificity. *See R.E. Davis Chem. Corp. v. Nalco Chem. Co.*, 757 F.Supp. 1499, 1517 n. 17 (N.D.Ill.1990) (citing *P.M.F. Servs., Inc. v. Grady*, 681 F.Supp. 549, 554 & n. 10 (N.D.Ill.1988)). If the funds involved in the violation of the statutes are alleged to have been fraudulently obtained, then the details of that underlying fraud

must be pled with particularity. *See Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 792 (3d Cir.1984), *cert. denied*, 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985).

The defendants rely on *Nalco* for their argument that the complaint must state the details of the alleged violations of §§ 2314 and 2315—specifically, the time and place of each occasion on which the funds were transported via interstate commerce—with particularity. *See Nalco*, 757 F.Supp. at 1516–17 & n. 17. The defendants misinterpret the holding in *Nalco* as holding that the stricter standard of FED.R.CIV.P. 9(b) must be applied to *all* elements of §§ 2314 and 2315 in RICO cases. This view is inconsistent with the support cited in the *Nalco* opinion. Rather, the line of cases that serves as the basis for the *Nalco* opinion holds that when funds obtained by fraud are transported or received in violation of §§ 2314 and 2315, and those violations serve as the predicate acts for a RICO claim, only the allegations describing the fraudulent acquisition of the funds must comply with FED.R.CIV.P. 9(b), and not the allegations of interstate transportation or other elements.

For instance, in *Construction Tech., Inc. v. Lockformer Co., Inc.*, 704 F.Supp. 1212 (S.D.N.Y.1989), which was cited as support in *Nalco*, the court applied the heightened pleading standard of Rule 9(b) to claims brought under §§ 2314 and 2315, but stated that it did so because the complaint described the items at issue as having been obtained through fraud. *Id.* at 1230 n. 12. *Lockformer* specifically noted that the non-fraud elements of §§ 2314 and 2315 (*i.e.*, transportation in interstate commerce with *scienter*) need not be set forth with particularity. *Id.*

*Lockformer* in turn cited *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 792 (3rd Cir.1984), which held that FED.R.CIV.P. 9(b) requires only fraud to be pled with particularity, not every element of an offense that contains fraud. That court also specifically stated that in alleging a violation of §§ 2314 and 2315, where and when the events of interstate transportation took place need not be pled specifically. *Seville,*

742 F.2d at 792 n. 7. Other courts agree. *See, e.g., Attick v. Valeria Assocs., L.P.*, 835 F.Supp. 103, 113 (S.D.N.Y.1992) ("When a violation of 18 U.S.C. § 2314 is pleaded as a RICO predicate act, only those elements of the violation that involve fraud must be pleaded with particularity. The other elements, including the element of interstate transportation . . ., are subject to the liberal pleading standards of FED.R.CIV.P. 8(a)."). *See also Executive Photo, Inc. v. Norrell*, 756 F.Supp. 798, 801–02 (S.D.N.Y.1991) (declining to apply Rule 9(b) requirements to non-fraud-based predicate acts); *Lewis v. Sporck*, 612 F.Supp. 1316, 1324 (N.D.Cal.1985) ("if the racketeering acts are not frauds, the general principles of pleading embodied in Rule 8 apply.").

The defendants have pointed to no case, nor can we find any, requiring a RICO plaintiff to plead the "what, where, and when" of the actual transfer of funds in order to state a claim under §§ 2314 and 2315. The defendants have extracted a statement from *Nalco* disparaging the § 2314 allegations there, noting that it was "impossible to discern from the complaint when, if ever, such documents did cross state lines." *Nalco*, 757 F.Supp. at 1512. There, however, the court was actually expressing doubt about whether the element of interstate transportation could be alleged at all; the complaint specifically stated that the documents were wrongfully obtained and studied within the boundaries of one state. By contrast, the complaint here contains nothing that would compel the conclusion that the funds at issue did *not* cross state lines, and Perlman's general allegations that they did so, Compl. ¶¶ 112, 114, are sufficient to meet the requirements of FED.R.CIV.P. 8(a).

In summary, the cases discussed above do not support the position, which an unduly broad reading of the opinion in *Nalco* might suggest, that all elements of §§ 2314 and 2315 must be pled with particularity. *Nalco* itself has never been cited for this proposition. Rather, the proper view, and the one we adopt here, is that only the fraud element

of §§ 2314 and 2315 must comply with FED. R.CIV.P. 9(b), and only in those cases in which the funds at issue are alleged to have been obtained through fraud.

In this case, the complaint states that the funds which were later transported were acquired through a scheme to defraud. We have already considered whether the allegations describing this underlying fraudulent scheme meet the standard of FED.R.CIV.P. 9(b), and have concluded that they do so. Accordingly, Perlman's §§ 2314 and 2315 claims conform with the pleading requirements of the Federal Rules and may serve as predicate acts for his RICO claims.[6]

### III. Pattern of Racketeering

The defendants' third broad attack on the complaint is that Perlman has not adequately alleged a pattern of racketeering, because the events set forth are lacking in relatedness as well as continuity, the two requirements necessary to show a pattern. *See H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 2900–01, 106 L.Ed.2d 195 (1989) (plaintiff must allege "that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity") (emphasis in original). The defendants also argue that each defendant's involvement is not properly pled.

### A. Relatedness

The necessary relatedness of the predicate acts may be found where the acts "'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" *Id.* at 240, 109 S.Ct. at 2901 (quoting 18 U.S.C. § 3575(e)). Here, Perlman alleges that the defendants' various schemes have a common purpose and result: to defraud Perlman and other investors by inducing them to invest and then taking or diverting the profits and assets of the investments

---

6. Sections 2314 and 2315 require that each act of transportation or receipt have involved funds worth $5,000 or more. Perlman has alleged the estimated value of many transactions. Compl. ¶¶ 93, 95. Only those which can be shown to have involved at least $5,000 violate §§ 2314 and/or 2315.

to the defendants' own pockets. Perlman also alleges that there was a common method of commission, in that the means by which defendants typically perpetrated these schemes was through the hidden manipulation of the assets of many Zell-related entities, in a giant shell game. Thus, the relatedness requirement is met.

The defendants argue that the scheme in which they are alleged to have wrongfully diverted insurance proceeds to Rocket Construction Company is not sufficiently related to the other schemes to be part of the pattern. We disagree. The method of commission—the diversion of assets away from entities owned by outside investors and toward entities owned by the defendants—is the same, regardless of whether the specific assets in question are the insurance proceeds properly due to other partnerships (as in the Rocket scheme) or properties once owned by the other partnerships (as in the scheme to defraud investors in the Class I partnerships). Accordingly, we find that the Rocket diversion scheme is sufficiently related to be a part of the pattern. The defendants also contend that the alleged scheme to falsely cancel Perlman's stock in the law firm now known as Rosenberg Liebentritt is too unrelated to the other schemes to be considered part of the pattern. Because we have already held that the Rosenberg Liebentritt stock scheme may not serve as a basis for Perlman's RICO claims, we need not reach this argument.[7]

### B. Continuity

The second requirement to show a pattern of racketeering activity is the continuation of the criminal activity over time, either in the past (closed-ended continuity) or through the threat of future criminal activity (open-ended continuity). See H.J. Inc., 492 U.S. at 241, 109 S.Ct. at 2901–02. The complaint here is replete with allegations of continuous activity. In the securities fraud claim, the issuance of additional Participation Units at regular intervals over a seven-year

period, and the repeated issuance of Annual Statements listing allegedly false statements of the Units' value, demonstrates closed-ended continuity. Other allegations portray the defendants as employing the *modus operandi* of regular self-dealing to the detriment of outside investors, and the fraudulent manipulation of partnerships' assets to cover their tracks and increase their personal gains. If true, this picture would suggest a credible threat of continuing future criminal activity. *Id.* at 242, 109 S.Ct. at 2902 (open-ended continuity may be shown where the predicate acts "are part of an ongoing entity's regular way of doing business").

Moreover, the allegations here also succeed under the factors identified in *Uniroyal Goodrich Tire Co. v. Mutual Trading Corp.*, 63 F.3d 516, 524 (7th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 916, 133 L.Ed.2d 846 (1996): "the number and variety of predicate acts, the length of time over which they were committed, the number of victims, the presence of separate schemes, and the occurrence of distinct injuries." It is indisputable that a number of predicate acts and schemes are alleged to have been committed over a period of several years, and that they are alleged to have resulted in many distinct injuries to several victims. None of the defendants' arguments to the contrary convince us that Perlman's allegations merely show the type of sporadic misconduct rejected in *H.J. Inc.*, *i.e.*, wrongful conduct "extending over a few weeks or months and threatening no future criminal conduct." *H.J. Inc.*, 492 U.S. at 242, 109 S.Ct. at 2902. Rather, the allegations of the complaint adequately suggest comprehensive, long-lived patterns of activity.

### C. Allegations as to Each Enterprise and Each Defendant

The defendants' last argument with regard to the pattern element of RICO is that Perlman has failed to allege (1) that each defendant committed at least two predicate acts

7. The defendants raised another argument as well, that only one of any claims pled in the alternative may be counted toward the requirement of pattern. This argument does not affect our conclusions, because even excluding the alternate claim (either the securities fraud claim or the claim of conversion of the rights of the Participation Units), the complaint alleges more than enough predicate acts to satisfy the pattern requirement.

and participated in the pattern of racketeering activity, or (2) that each enterprise identified in the complaint participated in the pattern of activity. A close look at the complaint discloses that both of these arguments are simply baseless. Although the defendants' and enterprises' actions are sometimes described collectively, Perlman does not impermissibly confuse the allegations as to who did what. Instead, he specifically alleges more than two predicate acts for each defendant. He also spells out how each enterprise was involved in each predicate act. No more is asked of RICO plaintiffs. Accordingly, we find that Perlman has adequately alleged the RICO element of a pattern of racketeering activity.

## IV. Conduct of an Enterprise

■ The defendants argue that Count I is deficient because Perlman has not adequately alleged that each defendant conducted (or participated in the conduct of) an enterprise. The Supreme Court set out the "operation and management" test for conducting an enterprise in *Reves v. Ernst & Young*, 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), holding that "one is not liable under [§ 1962(c)] unless one has participated in the operation or management of the enterprise itself." *Id.* at 183, 113 S.Ct. at 1172. This does not mean that only upper-level managers can be liable, however. "Lower-rung participants" may also meet this test if they are "under the direction of upper management." *Id.* at 184, 113 S.Ct. at 1173. "An enterprise also might be 'operated' or 'managed' by others 'associated with' the enterprise who exert control over it as, for example, by bribery." *Id.* The defendants argue that Count I is defective because Perlman has not alleged that each named defendant had the authority to operate or manage the identified enterprises.

Perlman alleges generally in ¶ 215 of his complaint that each of the defendants named in that count "conducted and participated in the conduct of the affairs of" various enterprises named in that count. Those allega-

tions are sufficient to withstand a motion to dismiss. *See NOW v. Scheidler*, 897 F.Supp. 1047, 1072 n. 19 (N.D.Ill.1995). Although the allegations in the previous paragraph, ¶ 214—that each defendant is "employed by or associated with" the various enterprises—do not by themselves meet the *Reves* "operation and management" standard, neither do those allegations negate the more specific allegations of ¶ 215. Too, Perlman specifically alleges many of the defendants' operation of various enterprises elsewhere in the complaint, when describing the underlying predicate acts. *See, e.g.*, Compl. ¶¶ 140, 175.

Nevertheless, we remind Perlman that a less liberal standard applies once the case progresses further, and at that point he will have to prove the details of *how* each defendant operated or managed the named enterprises, not simply allege that they did so. For now, however, we find that Count I of the complaint meets the Rule 12(b)(6) requirements to adequately plead a claim under § 1962(c).

## V. Conspiracy

The defendants' very last argument is that Count III does not state a claim for RICO conspiracy, because the allegations that the defendants agreed to violate § 1962(b) or (c) are conclusory, and because Perlman has "intertwined" the conspiracy allegations with the allegations of the underlying acts, so that the defendants cannot tell what offenses he is actually alleging they conspired to commit. We reject this latter contention as having no basis in the complaint, and turn to a consideration of whether the allegations of conspiracy are conclusory.

■ *Schiffels v. Kemper Fin. Servs., Inc.*, 978 F.2d 344 (7th Cir.1992) laid out the pleading requirements for a RICO conspiracy to violate § 1962(c): [8]

[The plaintiff must] plead that each defendant agreed to conduct the affairs of an enterprise, that each agreed to the com-

---

8. The requirements to allege a conspiracy to violate § 1962(b) should track this formulation: i.e., that each defendant agreed to acquire or maintain an interest in or control of a RICO enter-

prise, that each agreed to the commission of two or more predicate acts, and that each knew that the predicate acts were part of a pattern of racketeering activity.

mission of at least two predicate acts, and that each defendant knew that those predicate acts were part of a pattern of racketeering activity.... [The plaintiff] must allege facts from which one can infer each defendant's agreement to violate § 1962(c). *Id.* at 352 (citations omitted). The Seventh Circuit also cited with approval the requirements outlined in *Rose v. Bartle*, 871 F.2d 331, 366 (3d Cir.1989), *i.e.*, that the complaint must contain factual allegations describing the conspiracy's composition, its goals, and the defendants' general roles in the conspiracy. *See Schiffels*, 978 F.2d at 352.

As discussed above, the complaint alleges, in Counts I and II and the allegations describing the underlying predicate acts, that each defendant personally conducted the affairs of at least one RICO enterprise, and/or acquired or maintained an interest in or control over such an enterprise. Likewise, the complaint sets forth in considerable detail the predicate acts actually alleged to have been committed by each defendant in furtherance of the various RICO schemes. Thus, the first two requirements of *Schiffels* are met.

The complaint must also allege that each defendants knew that the predicate acts were in furtherance of an illegal scheme. This *scienter* element requires that the defendant " 'was aware of the essential nature and scope of the enterprise and intended to participate in it.' " *United States v. Stephens*, 46 F.3d 587, 592 (7th Cir.1995) (quoting *United States v. Bruun*, 809 F.2d 397, 410 (7th Cir.1987)). Perlman has directly alleged the defendants' knowledge in ¶ 239 of the complaint: "The Count III defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above." As provided by Federal Rule of Civil Procedure 9(b), "knowledge[ ] and other condition[s] of mind of a person may be averred generally." An agreement between the defendants also may be inferred where they are alleged to have worked closely together in a business setting. *See Terrell v. Childers*, 836 F.Supp. 468, 475 (N.D.Ill.1993) (noting that the element of *scienter* may be established by circumstantial evidence and finding that the fact that defen-

dants were officers of the enterprise, "the apparent closeness with which they worked[,] and the extent of their individual and collective involvement in the [plaintiffs'] affairs clearly supports an inference of agreement."). Examining the complaint as a whole, we find that Perlman has adequately alleged the defendants' agreement to violate RICO.

The allegations of conspiracy also comply with the *Rose v. Bartle* standards, stating (as to each conspiracy) the time period of the conspiracy, the conspiracy's goals, and the actions taken in pursuit of those goals. Compl. ¶ 238. Perlman has adequately alleged a RICO conspiracy, and Count III of the complaint will not be dismissed for failure to state a claim.

## CONCLUSION

For all of the reasons stated above, the Court denies the defendants' motion to dismiss. In so doing, the Court must emphasize that it has applied, as it must, liberal pleading standards in deciding the pending motion. The standards will, of course, be different if the defendants file motions for summary judgment after the close of discovery, or if the case proceeds to trial.

All fact discovery in this case must be completed by February 28, 1997. The parties shall appear for a status hearing on August 2, 1996 at 9:00 a.m. to set a proper litigation schedule for resolving this lawsuit.